IRVING, J.,
 

 for the Court.
 

 ¶ 1. After being removed as executor for the Estate of Virginia Margaretta Dodson, Cuyler A. Dodson (C.A.) requested reimbursement for executor fees and expenses. The Harrison County Chancery Court ruled that C.A. would “be barred from any claim for fees and expenses” on the basis of maladministration of the estate by C.A. Aggrieved, C.A. appeals and asserts that the chancery court erred in failing to reimburse him for executor fees and that the findings and conclusions of the chancery court were arbitrary and capricious.
 

 ¶ 2. Having reviewed the record, we find no reversible error. Therefore, we affirm the judgment of the chancery court.
 

 FACTS
 

 ¶ 3. The decedent, Virginia Dodson, died on October 20, 1995, in Jackson, Mississippi. At the time of her death, she was a resident of Harrison County, Mississippi. The decedent’s will designated three beneficiaries: C.A., Geran Dodson, and Jeffrey Dodson.
 
 [1]
 

 ¶ 4. On December 1, 1995, C.A. filed a motion for “Probate of Estate and Letters Testamentary.” The decedent’s will named C.A. as executor of the estate and named Geran as an alternate executor in the event that C.A. was not able to serve as executor. Thereafter, C.A. was appointed executor of the estate.
 

 ¶ 5. After his appointment, C.A. filed: (1) a petition to repair the decedent’s house in Gulfport, Mississippi; (2) a petition for partial distribution; and (3) a petition to sell real property in Jackson County, Mississippi. The decedent’s Gulfport residence was ultimately sold in February or March 1998. Some time prior to the sale, C.A. and Geran met at the Gulfport residence and removed various personal items. Jeffrey did not receive any property at that time, but he was aware that Geran and C.A. were meeting to remove items from the house. Geran contends that the property that was removed was worth a total of nine thousand dollars, and that he and C.A. had each removed about $4,500 worth of items. By contrast, C.A. contends that what he took was worth only three thousand dollars.
 

 ¶ 6. Between March 1998, when the house was sold, and April 2000, very little was done by C.A. to close the estate. On April 10, 2000, Geran and Jeffrey filed a motion to remove C.A. as executor of the estate. In their motion, Geran and Jeffrey contended that C.A. had failed to close the estate in a reasonable amount of time, that C.A. had not done anything to close the estate in over two years, that C.A. had failed to complete annual accountings for the estate, and that C.A.’s dependency on alcohol or other controlled substances had rendered him incompetent to act as executor of the estate.
 

 ¶ 7. On May 1, 2000, C.A. was ordered to post a bond in the amount of $250,000 and file an accounting of the estate by May 15, 2000. Thereafter, C.A. filed an accounting on May 15, 2000, after which Geran and Jeffrey renewed their motion to remove C.A. as executor. On June 27, 2000, C.A. was temporarily removed as executor of the estate, and Robert Williford, an attorney, was appointed as temporary administrator of the estate. Among other things, Williford was specifically ordered to determine the status of bank accounts and other assets of the estate and to determine the location and condition of vehicles and other personal property.
 

 
 *76
 
 ¶ 8. On May 17, 2001, Geran and Jeffrey filed a renewed motion seeking C.A.’s permanent removal as executor. In the motion, they notified the court that C.A. had been convicted of a felony. The sentencing order attached to the motion showed that C.A. had been convicted of possession of a controlled substance, a felony, and had been sentenced to serve two years in prison. C.A.’s sentence began sometime in 2000. It is not clear whether he served his entire sentence. It appears that this was C.A.’s second felony conviction, although there is scant evidence of C.A.’s first felony, which he was apparently convicted of in 1984, in the record. After the filing of this second motion requesting his removal as executor, C.A. agreed to step aside and allow Williford to be appointed administrator of the estate. Geran and Jeffrey filed a response requesting that Geran be appointed administrator of the estate instead of Williford.
 

 ¶ 9. On August 22, 2001, C.A. was allowed to withdraw as executor, and Geran was appointed administrator of the estate. C.A. was given thirty days to file a final accounting of the estate and was also ordered to relinquish all the records and assets of the estate. On November 30, 2001, Williford filed a petition to approve his first and final accounting. Attached to Williford’s petition was an inventory of the assets of the estate, which included bank accounts, jewelry appraisals, and other personal propei'ty. Interestingly, the appraisals indicated that the appraiser had been told that the jewelry belonged to C.A.
 

 ¶ 10. On May 6, 2002, Geran filed a petition seeking a partial distribution of sixty thousand dollars to each of the beneficiaries. Geran asked that C.A.’s disbursement be withheld until he repaid all of the money that he had taken from the estate without permission. On the same day, Geran filed a motion seeking to hold C.A. in contempt of court for his failure to timely file the accounting that had been ordered on August 22, 2001.
 

 ¶ 11. On May 31, 2002, a partial distribution to Geran and Jeffrey was ordered. The order also included a distribution for C.A. that was to be held in trust until C.A. filed a final accounting and repaid any monies that he owed the estate. On September 9, 2002, C.A. filed his final accounting. Attached to the accounting was a list that included, among other things, accounts that had been closed and items that had been sold during C.A.’s tenure as executor. C.A.’s accounting revealed that he had sold various personal items, including a bedroom set and two televisions. No further documentation regarding sale of any personal items was provided with C.A.’s accounting.
 

 ¶ 12. A little over four months later, on January 29 or 30, 2003, C.A. filed an emergency petition for his sixty-thousand-dollar distribution, minus the amount he owed the estate. In his petition, C.A. contended that he had not received his distribution despite filing his accounting with the court on September 9, 2002. The petition admitted that C.A. still owed the estate almost thirty thousand dollars. The petition also sought costs, sanctions, and a finding of contempt against Geran. An agreed order was entered on January 30, 2003, permitting a partial distribution of thirty-one thousand dollars to C.A.
 

 ¶ 13. On November 12, 2003, Geran filed his first accounting. On November 21, 2003, a little more than a week after the filing of the accounting, Geran filed a supplemental accounting. The supplemental accounting included the nine thousand dollars in personal items that Geran and C.A. had removed from the Gulfport home prior to its sale.
 

 ¶ 14. On January 21, 2004, C.A. filed a response objecting to Geran’s accounting,
 
 *77
 
 a second petition requesting that Geran be held in contempt, and a petition requesting that C.A.’s final accounting be approved by the court. C.A. objected to Geran’s accounting for
 
 a
 
 variety of reasons. The petition requesting approval of C.A.’s accounting also asked the chancery court for reimbursement for almost one hundred hours of work that C.A. claimed to have done for the estate and for $4,556.89 in reimbursement for expenses that C.A. had incurred as executor for the estate. Those expenses consisted of payments for mileage and meals, both of which were based on the federal travel rates.
 

 ¶ 15. In July 2004, Geran filed a response to C.A.’s petition for contempt, in which Geran stated that C.A. had yet to repay the estate in full for money he had taken without the chancery court’s permission. Also in July 2004, Geran filed a response to C.A.’s petition for approval of his accounting. In that response, Geran contended that C.A. failed to account for various estate assets, that C.A. withdrew money from the estate’s account for personal use without the court’s permission, that C.A. had not revealed to the court that he had been convicted of a felony prior to his appointment as executor, and that the fees and expenses that C.A. sought reimbursement for were overly large and lacked documentation.
 

 ¶ 16. On November 27, 2006, a hearing was held on all of the outstanding motions and petitions. Geran and C.A. were both present at the hearing; Jeffrey filed a waiver of process and did not attend the hearing. After hearing testimony and reviewing the documentary evidence in the case, the chancellor entered a judgment on January 30, 2007, that found in relevant part that: (1) at the time when C.A. was initially appointed as executor of the estate, he should have been statutorily barred from that role pursuant to Mississippi Code Annotated section 91-7-35 (Rev.2004) due to his prior felony conviction; (2) there was a dispute as to the value of the property that C.A. and Geran removed from the Gulfport house prior to its sale, but that the evidence showed that each took property worth approximately $4,500; (3) there were three World Series Championship rings at issue, but that there was no evidence to show that they belonged to the estate; (4) Geran’s counsel was entitled to attorney’s fees in the amount of $15,750; (5) there were twelve pieces of jewelry still in the possession of the estate and that the jewelry had been valued as worth $6,050 at one time; (6) C.A. had admitted that he was indebted to the estate in an amount around twenty-nine thousand dollars; (7) fifteen thousand of the twenty-nine thousand dollars was “borrowed from the estate without court approval”; (8) C.A. claimed that he had repaid three thousand dollars from the fifteen thousand that he borrowed without permission; (9) C.A. was seeking reimbursement for fees for tax preparation that were performed by a company wholly owned by C.A.; (10) Geran and Jeffrey had received distributions worth $135,863 each and that C.A. had also received a distribution worth $135,863, consisting of $106,000 plus $29,863 in loans that were repaid to the estate; (11) there was no need to order a sale of the six thousand dollars in jewelry, but that the beneficiaries should attempt to divide the jewelry by agreement and sell it to the highest bidder if they were unable to do so; (12) C.A. had failed to disclose important pieces of information to the court, such as his prior felony, his loans from the estate, and that he was paying his own accounting firm for services to the estate; (13) C.A. had “unclean hands” as a result of the multiple deceptions that he had perpetuated on the court; (14) C.A. “should be barred from any claim for fees and ex
 
 *78
 
 penses”; (15) C.A. had maintained insufficient records to show that he was entitled to reimbursement for fees and expenses; (16) C.A. had “effectively” done little in his role as executor of the estate, inasmuch as he had only published notice to creditors, sought to repair and then sold the decedent’s house, sold a piece of real property in Jackson, and sought and made a partial distribution; and (17) C.A. had done nothing to close the estate between March 1998 and April 2000.
 

 ¶ 17. On February 12, 2007, C.A. filed a motion for a new trial. C.A. alternatively asked that the court alter or amend its final judgment. In his motion, C.A. claimed that neither he nor his counsel became aware of the court’s judgment until February 5, 2007. C.A. argued in his motion that he was entitled to reimbursement for his work on the estate. C.A. also contended that one of the two loans that had been made to C.A. from the estate had been made before the decedent’s death. C.A. also stated in the motion that he had been charged with possession of a firearm, but that the charge had been dismissed, despite the chancery court’s statement in its judgment that C.A. had been convicted of possession of a firearm by a felon.
 

 ¶ 18. On February 20, 2008, the chancery court ruled on C.A.’s motion for a new trial. In so doing, the court incorrectly stated that the motion was filed on February 9, 2007. In summarizing its 2007 judgment, the chancery court stated that “C.A. Dodson was statutorily barred from serving as fiduciary due to a prior felony conviction; that he had surreptitiously ‘loaned’ monies from the estate to himself; and that he had engaged in self-dealing by acting as accountant for the estate for a fee.” The chancery court acknowledged that its 2007 judgment incorrectly stated that C.A. had been convicted of being a felon in possession of a firearm: “The Court stands corrected in that C.A. Dodson was convicted on two counts of possession of crack cocaine, and not of being a convicted felon in possession of a firearm. Nevertheless, he was still disqualified at a time when he represented to the Court that he was qualified.” Thereafter, C.A. filed a notice of appeal on March 14, 2008.
 

 ¶ 19. Additional facts, as necessary, will be related during our analysis and discussion of the issues.
 

 ANALYSIS AND DISCUSSION OF THE ISSUES
 

 1. Reimbursement of Executor’s Fees and Expenses
 

 ¶ 20. In reviewing the factual findings of a chancellor, we will reverse only if those findings are “manifestly wrong or clearly erroneous.”
 
 Warren v. Derivaux,
 
 996 So.2d 729, 734-35(¶ 10) (Miss.2008) (quoting
 
 Bowers Window Door Co. v. Dearman,
 
 549 So.2d 1309, 1312-13 (Miss.1989)). However, we review “issues of law under a de novo standard, and will reverse if the law has been applied or interpreted erroneously.”
 
 Id.
 
 (citing
 
 Miss. Transp. Comm’n v. Fires,
 
 693 So.2d 917, 920 (Miss.1997)).
 

 ¶ 21. C.A. contends that he was forced to handle the estate when Geran and Jeffrey declined to travel to Mississippi to do so. C.A. claims that he acted in the estate’s best interests over the five years that he was executor. He points out that he sold the home in Gulfport and a piece of real property in Hinds County, even though neither property was close to C.A.’s residence. C.A. claims that he spent “numerous hours” getting the Gulf-port house ready for sale. C.A. further claims that he repaired and then sold an RV that had belonged to the decedent. C.A. argues that he also had the jewelry that belonged to the estate appraised.
 

 
 *79
 
 ¶ 22. G.A. directs our attention to Ger-an’s first and final accounting, wherein Geran stated that there was no longer any real property possessed by the estate, as it had all been disposed of prior to Geran’s involvement with the estate. Geran also stated in his accounting that all of the estate’s debts had been paid and that all bequests according to the decedent’s will had been paid prior to Geran’s appointment as administrator of the estate. C.A. contends that all of these things had been done already because he performed them during his tenure as executor of the estate.
 

 ¶ 23. C.A. denies that he breached his fiduciary duties when he loaned himself money from the estate. While he admits making the loan, he attempts to explain why he did so:
 

 [I] admitted on the stand that [I] loaned [myself] money from [my] portion of the estate when [I] learned, after the death of the Decedent, that the Decedent, while serving as the treasurer of [my] company and working therein, had failed to pay a [flederal tax deposit for the corporation in the approximate sum of $15,000.... [H]aving no way to pay the required sum, [I] borrowed from the funds which [I] would be receiving from the Estate.
 

 C.A. further claims that he disclosed the loan on his first accounting, which was filed on May 15, 2000. As to the court’s finding that C.A. improperly hired his own company to do work for the estate, C.A. notes that his company prepared the decedent’s tax returns every year for ten years preceding her death. He also testified that he did not personally perform any of the estate work, although he admitted that he was the one hundred percent owner of the accounting company that had performed the work.
 

 ¶ 24. C.A. contends that any errors or improprieties that he committed were mere mistakes and “were never hidden from anyone.” He points to Geran’s testimony, wherein Geran admitted having made several mistakes during his administration of the estate. C.A. further points out that Geran filed several accountings that were incorrect and that were only corrected after C.A. filed an objection requesting correction of the accountings.
 

 ¶25. As to his felony conviction, C.A. claims that he “was unaware that his felony conviction many years prior disqualified him as fiduciary.” C.A. argues that the decedent was aware of his felony conviction when she designated him as executor of her estate. Furthermore, C.A. argues that Geran and Jeffrey were aware of his felony conviction when he was appointed as executor of the estate. Accordingly, C.A. contends that “G[eran] and J[effrey] received the benefit of C.A.’s labor and did so with personal knowledge at
 
 all times
 
 of C.A.’s prior felony conviction.” C.A. argues that he never attempted to hide his status as a convicted felon from the court, but that he was simply unaware that the conviction prohibited him from acting as executor. We note that C.A. filed multiple sworn documents in the proceedings below wherein he averred that he was qualified to act as executor of the estate. Such a statement necessarily implies that C.A. was aware of the qualifications to be an executor.
 

 ¶ 26. C.A. disagrees with the chancery court’s assessment that C.A. was the cause of extra expense to the estate. Specifically, C.A. contends that:
 

 the fees of $14,824.84 paid to Patterson & Thibodeaux, P.A. in 2002 were legal fees for work performed to administer the Estate, whereas the fees of $15,750.00 awarded unto Butler, Snow, O’Mara, Stevens & Cannada in 2007, were for work performed in G[eran]’s vendetta against C.A., fostering his sue-
 
 *80
 
 cessful attempt to delay distributing to C.A. his rightful share of the Estate and to keep C.A. from being awarded a fee for the countless hours he expended in this matter. C.A. would further show that G[eran’s] attorney[’s] fees through the entry of the Order on Post-Trial Motions entered on February 20, 2008, were paid by the Estate, while C.A.’s [attorney’s] fees since 2002 have been borne by C.A. individually. C.A. would show that the lower Court erred in awarding G[eran] his attorney fees for his numerous attempts to prevent C.A. from receiving his fair distribution from the Estate and to prevent C.A. from receiving a fee for the time and expenses incurred in furthering the Estate.
 

 ¶ 27. C.A. contends that he is entitled to reimbursement either in quantum meru-it or for unjust enrichment. Ultimately, C.A. argues that he “had the daunting task and immense responsibility of cleaning out the Decedent’s household effects, selling the Decedent’s properties^] and managing an [e]state valued at over $450,000.” As support for his argument, he quotes the following from
 
 Ralston v. Bank of Clarksdale,
 
 188 Miss. 345, 351, 194 So. 923, 924-25 (1940):
 

 There are numerous elements that enter into the consideration of what amount of compensation should be allowed within the limits fixed by law, and the mechanical work of making out the reports and of collecting the money and of disbursing it is not the only thing to be considered. The skill, the responsibility, and the amount involved are elements that the Court will take into consideration in fixing such compensation.
 

 However, we note that the
 
 Ralston
 
 court went on to hold that:
 

 Service skillfully, promptly, and efficiently rendered should be recognized as being of value to the estate in administering it and the speedy disposition of the matter winding up and settling the estate are important elements and are factors to be recognized and encouraged.
 
 It is not merely the labor performed or required in the manual work of collecting and disbursing the funds of the estate, but the responsibility and skill are important elements.
 
 There are often matters in which skill and business judgment become very desirable factors, and these properly exercised save much trouble and confusion in such matters.
 

 Id.
 
 at 351,194 So. at 925 (emphasis added).
 

 ¶ 28. Mississippi Code Annotated section 91-7-299 (Rev.2004), which governs the compensation given to executors and other estate fiduciaries, states:
 

 On the final settlement the court shall make allowance to the executor or administrator for the property or the estate which has been lost, or has perished or decreased in value, without his fault; and profit shall not be allowed him in consequence of increase. The court shall allow to an executor or administrator, as compensation for his trouble, either in partial or final settlements, such sum as the court deems proper considering the value and worth of the estate and considering the extent or degree of difficulty of the duties discharged by the executor or administrator; in addition to which the court may allow him his necessary expenses, including a reasonable attorney’s fee, to be assessed out of the estate, in an amount to be determined by the court.
 

 ¶ 29. It is not disputed by C.A. that he was not qualified to act as executor of the estate due to his prior felony conviction. Although he argues that he did not intentionally withhold his prior felony conviction from the court, he does not dispute the existence of the conviction. Mississippi
 
 *81
 
 Code Annotated section 91-7-35 (Rev. 2004) states that anyone who has been “convicted of a felony” is incapable of being the executor of an estate. Therefore, it is clear that C.A. was never qualified to act as executor of the estate. Regardless, C.A. contends that he is entitled to reimbursement for the actions he took on behalf of the estate on the basis of recovery in quantum meruit.
 

 ¶ 30. We find that C.A. is not entitled to reimbursement from the estate on the basis of quantum meruit or otherwise. In
 
 Estate of Collins v. Collins,
 
 742 So.2d 147, 150 (¶¶ 12-13) (Miss.Ct.App.1999), this Court noted that executors are allowed compensation under section 91-7-299. However, we went on to note that there are circumstances under which a court may decline to compensate an executor for work on an estate:
 

 However, in the event that the executrix is found to have maladministered the estate,
 
 the chancellor is within his discretion to disalloiv fees. [Scott v.] Hollingsworth,
 
 487 So.2d [811,] 815 [(Miss.1986)]. In this case, the chancellor found that the estate was administered in a “grossly negligent” manner. In support of this finding of negligent administration, or maladministration, the chancellor cited the executrix’s noncompliance with court orders which eventually culminated in her being found guilty of civil and criminal contempt on August 7, 1997.
 

 Id.
 
 at 150 (¶ 13) (emphasis added).
 

 ¶ 31. The chancellor in this case found that C.A. had breached his fiduciary duties, that he had caused waste to the estate, and that his misrepresentations caused him to have unclean hands. Having reviewed the record, we cannot find that the chancellor was clearly erroneous in making these determinations. C.A. kept inadequate records regarding some of the estate’s assets; he removed items from the Gulfport home without court approval; C.A. hired his own company to perform work for the estate without first obtaining court approval; he was disqualified from serving as executor due to a prior felony conviction, regardless of his testimony that he was unaware that such disqualified him from acting as executor; and, most seriously of all, he took money from the estate without court approval or knowledge. As to this last item, we find C.A.’s excuse that he took money in part because the estate owed him money to be wholly inadequate. Even if such was the case, there is no explanation of why C.A. did not inform the court and seek court approval for the loan.
 

 ¶ 32. Furthermore, there is no explanation on C.A.’s part as to why the estate was not closed in a timely manner. From the record, it appears that C.A. initially took steps to administer the estate, but for several years, nothing was done to close it. In
 
 Will of McCaffrey v. Fortenberry,
 
 592 So.2d 52, 64 (Miss.1991), our supreme court discussed an executor’s responsibility to close an estate timely:
 

 We take this opportunity to note that when a beneficiary is ready, willing and capable of managing an estate’s income and disbursements, then the proper course for a fiduciary would be directed at efforts to bring about a closure and distribution of the estate assets without delay. Rather than taking the necessary steps to close the estate, Forten-berry allowed it to remain open for ten years.
 
 It is well known that an executor has a responsibility to move forward with due diligence in probating and, closing the affairs of an estate. Such a responsibility is inherent in one’s obligation as a fiduciary.
 

 (Emphasis added). There is substantial evidence in the record to support the chancellor’s finding that C.A. did not act with
 
 *82
 
 due diligence in closing the estate in this case.
 

 ¶ 33. C.A.’s delay in closing the estate and his other indiscretions as executor, most notably his decision to borrow thousands of dollars from the estate without court approval, provided ample reason for the chancery court to refuse to reimburse C.A. for his work as executor. The chancery court was not clearly erroneous in finding such, and this contention of error is accordingly without merit.
 

 2. Arbitrary and Capricious Findings
 

 ¶ 34. In his second contention of error, C.A. claims that the chancery court’s findings are arbitrary and capricious. As we have already noted above, the record provides ample support for the chancery court’s findings. However, in the interest of thoroughness, we will briefly address C.A’s specific contentions.
 

 ¶ 35. First, C.A. claims that the court erred in stating in a posttrial ruling that C.A. would keep possession of some contested jewelry that he “found.” In its judgment, the court ruled that C.A. would keep the rings because “there [was] no sufficient showing to satisfy the Court that the World Series rings belong to the Estate.” This Court finds that the minor variation in the chancery court’s language between its judgment and its posttrial ruling does not rise to the level of an arbitrary and capricious finding. The chancery court clearly found that the rings belonged to C.A. and were not part of the estate.
 

 ¶ 36. Second, C.A. disputes the chancery court’s summation of his activities as executor. Having reviewed the chancery court’s list, which included C.A.’s publishing of notice, his repair and sale of the Gulfport home, his sale of real property in Jackson, and a partial distribution that C.A. made, we find little material variance between the court’s list and C.A.’s. Present on C.A.’s list but absent from the chancery court’s was C.A.’s hiring of attorneys to help him administer the estate; his meetings with “appraisers, realtors and subcontractors to determine the best interest of the Estate in selling the home in Gulfport”; his sale of an automobile; his actions in closing the decedent’s personal accounts; the sale of some items of personal property; his work in obtaining appraisals for jewelry belonging to the estate; his repair and sale of an RV owned by the decedent; and his attempts to determine whether the decedent had owned stock in Pharmacia, Solutia, GTE, and Monsanto.
 

 ¶ 37. Meetings with appraisers and realtors are logically encompassed by the court’s acknowledgment that C.A. had wox*ked to sell the Gulfport home as well as other real property. The chancery court’s opinion mentioned C.A.’s attorneys several times, so it is clear that the court knew that C.A. had hired attorneys to help him close the estate. Likewise, the stock and attempts to locate the stock were noted in the court’s opinion. Although the chancery court did not explicitly state that C.A. obtained appraisals for the jewelry, the appraisals were mentioned. Furthermore, since C.A. had the jewelry appraised but took no further steps to sell the jewelry or close the estate, it is unclear to this Court what relevance his acquisition of an appraisal has. Ultimately, the only acts that C.A. claims to have committed that were not specifically noted by the chancery court were his sale of an automobile, his sale of an RV, his sale of various personal items, and his closing of the decedent’s personal accounts. At the trial of this matter, C.A. claimed that he sold the RV at auction for $7,550. This Court has been unable to find any further documentation in the record regarding the sale of the RV;
 
 *83
 
 certainly there is nothing showing that the court authorized its sale.
 
 [2]
 

 ¶ 38. As to C.A.’s sale of the decedent’s personal items, we note that Geran and Jeffrey’s renewed motion seeking C.A.’s removal pointed out that C.A.’s initial accounting filed with the court did not even mention any personal property that had been owned by the decedent. Furthermore, when his attorney asked him what additional property he took from the estate, C.A. testified: “I bought a TV from the estate, which I paid the estate for. There may have been some other things, but I listed it as to what it was. I got an appraisal on what it was, and then I paid the estate that amount of money on there.” Although it is not clear what television and “other things” C.A. was referring to, it is reasonable to infer that these items are the same items that C.A. claims to have spent effort “selling” on behalf of the estate. We find that it was not arbitrary and capricious for the court to fail to mention these specific items, the disposal of which was poorly documented by C.A. in his accounting.
 

 ¶ 39. Third, C.A. argues that the chancellor incorrectly found that C.A. was seeking reimbursement for tax preparation fees. C.A. contends that this statement is incorrect because his “employees” prepared the returns rather than himself. The chancery court also noted this proffered distinction but found it without substance. We do not find that the chancellor was arbitrary or capricious in doing so. The company in question was owned solely by C.A., so any profit from the work would have gone to him and him alone.
 

 ¶ 40. Fourth, C.A. contends that the chancellor incorrectly found that C.A. did nothing to close the estate from March 1998 until April 2000. C.A. argues that he was spending this time “attempting to locate the missing court file for the Estate of the Decedent’s mother in order to determine the identity, location and value of the stocks which he believed had been left to the Decedent by her mother.” The record reflects that C.A. was informed sometime in October 1997 that it would be necessary to find the court file. C.A. has offered no explanation as to why looking for the court file took over two years. Furthermore, C.A.’s own statement, attached to his petition to approve his accounting, of the work he had done for the estate listed nothing from August 1998 to April 2000. As such, the chancellor did not act arbitrarily or capriciously in determining that C.A. effectively did nothing for the estate during this two-year period. Furthermore, for some period of time beginning in 2000, C.A.’s involvement with the estate was necessarily limited due to his incarceration.
 

 ¶ 41. Finally, C.A. contends that the court was incorrect when it stated that C.A.’s prior felony conviction was brought to the court’s attention on May 17, 2001. C.A. argues that his prior felony was first discussed on July 8, 2004. From our review of the record, it is clear that on May 17, 2001, C.A.’s second felony conviction was first brought to the court’s attention. It is unclear from the record before us when the chancery court first learned of C.A.’s 1984 conviction. Even if the court mistakenly stated that it learned of the 1984 conviction on May 17, 2001, we find that such a mistake does not constitute an arbitrary and capricious finding. Ultimately, regardless of the exact date on which the court learned of the conviction, the undeniable truth is that C.A. had been
 
 *84
 
 convicted of a felony but nevertheless swore to the chancery court that he was qualified to act as executor.
 

 ¶ 42. This contention of error is also without merit.
 

 ¶ 43. THE JUDGMENT OF THE HARRISON COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., LEE AND MYERS, P.JJ., GRIFFIS, BARNES, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR.
 

 [1]
 

 . C.A., Geran, and Jeffrey are brothers and Virginia's stepsons.
 

 [2]
 

 . C.A.’s accounting also noted checks that were used to pay for repairs to the RV. The same accounting showed that the estate had paid almost eighty dollars for "Cablevision” in February 1996, presumably for cable television for the Gulfport residence. Since the decedent passed away in 1995, it is unclear to this Court why the estate was still paying for cable television at her house almost a year later.